FILED

03 NOV 14  P 1: 37

S DISTRICT COURT HARTFORD CT

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| B.L., by and through her parents and next Friends, Mr. and Mrs. L., | : | Civil Action No. |
| Plaintiffs, | : | 3:02CV0767 (CFD) |
| v. | : | |
| | : | |
| New Britain Board of Education, | : | |
| Defendant. | : | November 14, 2003 |

## DEFENDANT'S RULE 9(C)(1) STATEMENT
## OF MATERIAL FACTS NOT IN DISPUTE

1.  This action is an appeal of a final decision issued by Due Process hearing Officer Margaret Slez dated February 19, 2002 and an appeal of a final decision dated March 25, 2002. [Plaintiff's May 3, 2002 Complaint (hereinafter "Complaint), ¶2; see February 19, 2002 State Department of Education Due Process Hearing Decision (hereinafter "Decision") and March 25, 2002 State Department of Education Decision regarding plaintiff's request for clarification, both attached to Complaint as Exhibit A.]

2.  The Student had received remedial reading services since first grade, the 1996-97 school year. [10/19/01 Testimony of Parent, p.14; Exhibit A, p.2 (Finding#1)] When the student

was in the second grade, the parents reported "increased difficulty with simple

paperwork" and raised questions regarding attention and inconsistent academic

performance. [Board Exhibits 10-11] A PPT meeting was convened on February 23,

1998, and the Board agreed to undertake the comprehensive evaluation requested by the

parents. [Exhibit A, p.2; Board Exhibit 11]

3.    The comprehensive evaluation was done in March 1998 [Board Exhibit 13]. Intellectual

assessment suggested that the Student was "solidly functioning within the Average

range." [Id.] On the WISC-III, the student achieved a verbal scale IQ score of 102, a

performance scale IQ score of 106, and a full scale IQ score of 104. [Id.] Although the

Student did demonstrate some relative strengths and weaknesses, performance on verbal

and nonverbal tasks indicated "even cognitive development." [Id.] In the verbal area, the

Student demonstrated a relative strength in social judgment and general common sense,

as well as above average abilities in word knowledge, general fund of information, and

good conceptual thinking. [Id.] Weaknesses were found in the student's numerical

reasoning ability and perception of spatial relations. [Id.] The educational assessment

indicated that the student was academically functioning on grade level in the areas of

reading and writing, but math skills were significantly below the Student's measured

intellectual potential. [Id.] Social/emotional assessment suggested that the Student's

2

externalizing behaviors were consistently within average expectations, but the tendency to be "nervous, fearful, or worried about real or imagined problems (anxiety)" was deemed Clinically Significant and the student's ability to adapt readily to changes in the environment was consistently rated as within the At-Risk range. [Id.]

4.    On April 14, 1998, a Multidisciplinary Composite Evaluation Report for Students Suspected of Being Learning Disabled was completed. [Board Exhibit B-14, pp.8-9; Decision, p.2 (Finding #3)]  The PPT determined that there existed a severe discrepancy between ability and achievement in mathematical computations and mathematical reasoning and that the discrepancy was not the result of visual, hearing, or motor impairment; mental retardation; emotional disturbance; environmental, cultural or economic disadvantage; or lack of motivation or opportunity to learn. [Id.]  The PPT further determined that the severe discrepancy was not correctable without special education and related services. [Id.]  Concluding that a specific learning disability had been identified and the Student was eligible for special education and related services, the PPT developed an IEP to be implemented for the balance of second grade and third grade. [Id.]

3

5.    The IEP developed on April 14, 1998, called for 27 hours of regular education and 3

hours of special education services. [Board Exhibit 14, p.5; Decision, p.2 (Finding #4)]

On March 8, 1999, the IEP team met to review the Student's progress in third grade, the

1998-99 school year. [B-15]  Although teachers noted that the Student had made both

academic and social progress, there was agreement that the Student should continue in

the Special Education Inclusion (S.E.I.) program based upon weaknesses in math skills,

written language, and organizational ability. [Id.]  Special education services were

increased to 5 hours in the IEP developed for the 1999-00 school year. [Id.; Decision

pp.2-3(Finding #4)]  At this IEP meeting, the parents indicated that they were considering

retaining the Student in third grade for the 1999-00 school year, to which the Board made

no objection. [Id., p.2; Decision, p.3(Finding #4)]


6.    By letter dated August 16, 1999, the parents notified the Board that they were obtaining

an independent psychoeducational evaluation of the Student and stated that "[w]e do

agree with [the Student's] retention in third grade as long as [the Student] receives the

support around [the Student's] area of deficit, which include learning disabilities and

health impairments." [Board Exhibit 19]  The hearing officer found that there was

nothing in the record to indicate that the Student has health impairments. [Decision, p.3

(Finding #5)]  The parents' letter also stated that "[a] complete language evaluation of

4

[the Student] is necessary as it is clear that [the Student] is impaired significantly in reading and writing." [Board Exhibit 19]  Additionally, the parents stated that "[t]his testing should include a look at [the Student's] central auditory processing." [Id.]

7.    Dr. Janet Schrager performed a psychoeducational evaluation on July 16, 1999 to address the parents' concerns with educational issues regarding the student. [Board Exhibit 20; Decision, p.3(Finding #6)]  The Student again scored at an average level for cognitive ability on the WISC-III, but Dr. Schrager found the achievement scores to be "considerably below grade level confirming the school's diagnosis of learning disability." [Id.]  Her report suggested the possible existence of "some kind of central auditory processing deficit." [Id.]  Dr. Schrager recommended a language and central processing evaluation by a speech/language therapist to understand the Student's lack of progress in phonetic awareness, spelling, reading, and writing; more extensive support services in those areas as well as in math; and further evaluation "to address the question of Attention Deficit Disorder and Anxiety." [Id.].  The hearing officer found that nothing in the record indicated that the Student had been diagnosed with Attention Deficit Disorder. [Decision, p.3(Finding#6)]

*LAW OFFICES* • **SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC** • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

8.    The PPT met on September 20, 1999, to review the Student's program. [Board Exhibit

21]  The parents requested a speech/language evaluation. [Id.]  The PPT met again on

October 25, 1999, to discuss the report of evaluation done by a Board speech/language

pathologist. [Board Exhibits 22-23]  On the Phonological Awareness Profile, criterion

referenced and designed to diagnose deficits in auditory phonological processing skills

necessary for a child to learn to read, the results indicated that the Student had mastered

segmentation, isolation, deletion, substitution, and blending. [Id.]  On the Test of

Language Development – Intermediate 3 (TOLD-I:3), which assesses receptive and

expressive language skills in the areas of grammar, syntax, and vocabulary, the Student

scored within the average range on all tasks.[Id.]  The Clinical Evaluation of Language

Fundamentals – 3d Edition (CELF-3) was given to assess semantic, morphological,

syntactic, and auditory memory skills. [Id.]  The Student scored within the average range

on various CELF-3 subtests which assess auditory processing of language at various

levels of length and complexity.  The Student's classroom teacher completed a language

skills checklist and the evaluating speech/language pathologist observed the Student in

the classroom setting. [B-22,p.4]  "[At] the discourse level," which is the highest level of

language functioning where all language skills must be synthesized, the Student's

"receptive (auditory processing) and expressive language skills are at least average."

[Board Exhibit 22; Testimony of Ann Butterfield, Board speech/language pathologist,

LAW OFFICES  •  SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC  •  646 PROSPECT AVENUE  •  HARTFORD, CONNECTICUT 06105-4286  •  (860) 233-2141
JURIS NO. 62326

1/1502 Transcript pp. 14-21, 54 ] The parents accepted the findings of the Board speech/language evaluation and agreed that "no phonological deficit exists." [Board Exhibit 25]

9.   By letter dated November 9, 1999, the parents asked that a PPT meeting be convened to discuss the parents' request for an independent "consultant/evaluation" by a person, mutually agreed-to by the Board and the parents, who would review all records and evaluations, interview the parents and Board staff, observe the Student throughout the school day, perform supplemental testing if necessary, and determine whether or not the Student's program is appropriate or requires revision. [Board Exhibit 25]  The parents also requested reimbursement for the evaluation done by Dr. Schrager. [Id.]

10.  The PPT met on November 19, 1999. [Board Exhibit 26]  Since the Student had met previously-established goals, a new IEP was developed. [Id.]  The Board agreed to an independent evaluation by a person to be jointly selected by the parties. [Id.]  The Board denied the parents' request for reimbursement for Dr. Schrager's evaluation. [Id.]

11.  Miriam Cherkes-Julkowski, Ph.D., was selected to do the independent evaluation which was agreed to by the parents and the school district. [10/19/01 Testimony of Parent, p.64;

LAW OFFICES  •  SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC  •  646 PROSPECT AVENUE  •  HARTFORD, CONNECTICUT 06105-4286  •  (860) 233-2141
JURIS NO. 62326

Board Exhibit 35] Dr. Cherkes-Julkowski did testing and an interview on April 19, 2000,

and observed the Student in the school setting on April 28, 2000. [Board Exhibit 35] Dr.

Cherkes-Julkowski reported decoding and spelling problems, difficulty with phoneme

awareness and phonological processing, superior test comprehension ("nearly very

superior despite some negative effects of decoding errors"), orthographic awareness

problems, math difficulties resulting from disorganized thinking ("cognitive disruption")

and average IQ. [Id.] "[The Student's] often loose language and otherwise chaotic

thinking is a reflection of the disorganization that [the Student] can experience." [Id.] Dr.

Cherkes-Julkowski recommended continued individual support in reading and spelling;

the use of a systematic, code-based reading program; one-on-one reading skill instruction

for at least 30 minutes daily; the use of Inspiration software to assist organizing the

Student's writing tasks; and a language therapist to assist the team in developing

objectives and instructional ideas for improving the Student's written and spoken

language. [Id.] Also, "[t]his testing suggests the need for psychiatric follow-up at least

through late adolescence." [Id.] Dr. Cherkes-Julkowski's report did make any findings of

central auditory processing difficulties. [Id.] Dr. Cherkes-Julkowski re-evaluated the

Student on November 28, 2001, but this re-evaluation was done during the pendency of

the due process hearing many months after the parents rejected the proposed 2001-02 IEP

and after the unilateral placement at Ben Bronz Academy. [Parent Exhibit 14] Nancy

LAW OFFICES • SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

McGraw of the school system, had contacted this evaluator prior to the parent's unilateral placement, on or about December 2000, who claimed to have no memory of the student. [B-57] The hearing officer found that this evaluator's later report of the re-evaluation is markedly at odds with Board personnel testimony during the course of the hearing and evaluations done prior to development of the challenged IEP, describing serious regression notwithstanding the Student's current placement in the private school and, thereby, undermined the credibility of the report. [Exhibit A, p.4(finding #10); Parent Exhibit 14; see 1/10/02 Testimony of Ann Butterfield, pp.23, 34-43; Testimony of Nancy McGraw, pp. 145-46]

12.     The PPT convened on June 1, 2000 to develop an IEP for fourth grade, the 2000-01 school year. [Board Exhibit 36] The team developed goals in the area of math, reading (using the Wilson program), written language skills, verbal reasoning, phonological awareness, and developing positive self-concept. [Id.] Consistent with Dr. Cherkes-Jukowlski's recommendations, the PPT agreed that the Inspiration software would be used to help the Student organize writing tasks and added direct counseling services for one half-hour each week to support the Student's confidence level. [Id.] The team further agreed that the special education teacher would consult with the Board speech/language pathologist regarding intervention plans for phonemic awareness and effective

9

formulation of curriculum language content in her verbal and written expression (i.e. explanations). [Id.] The Student would be permitted extra time on all assignments and on tests as needed. [Id.] The PPT also agreed to consult with Dr. Cherkes-Jukowlski to ensure that the PPT understood the recommendations she set out in her report to ensure implementation. [Board Exhibit 37]

13.    The PPT met again on September 7, 2000, to discuss parent questions and concerns. [Board Exhibit 43] The parents requested a central auditory processing evaluation and an assistive technology evaluation, both of which were refused by the Board. [Id.] Since central auditory processing was not mentioned in Cherkes-Julkowski's report, Board Exhibit 35, the PPT determined that no assessment was necessary. [Id.] The PPT agreed to obtain more information regarding assistive technology was to be obtained from Dr. Cherkes-Julkowski. [Id.] The PPT also offered the services of an independent consultant, Cathryn Riggs, Ph.D., to monitor the implementation of the Student's IEP – to which the parent agreed to discuss and respond. [Id.] The Student's Wilson reading program was reviewed as was the involvement of the Board speech/language pathologist in the implementation of the Wilson reading program. [Id.] The PPT also agreed to include a psychiatric evaluation in the Student's triennial assessments. [Id.]

*LAW OFFICES* • **SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC** • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

14.   The Student was referred by the Board to Joel Bregman, M.D., for a diagnostic school

psychiatric consultation. [Board Exhibit 49]  The Student was seen by Dr. Bregman on

November 8, 2000, and the family met him on December 5, 2000. [Board Exhibit 58]

Dr. Bregman reported that during the interview the Student was "energized, restless, and

fidgety, particularly during open-ended discussions and conversation" and "endorsed a

significant number of symptoms reflecting performance, anticipatory, and social anxiety

on a self-report checklist (the Revised children's Manifest Anxiety Scale)." [Id.] He

reported that the Student "worries a good deal about the impressions others have of [the

student], fearing that [the student] may not be well thought of and appreciated." [Id.]  The

student expressed "sensitivity regarding the views and opinions held of [the student] by

parents, teachers, and other authority figures, yet it was somewhat unclear as to the

strength and intensity of these feelings." [Id.] The student described school experience

"in positive terms," "fond of [the student's] teachers," connected with classmates, and

pleased with existing friendships. [Id.]  Although the student did acknowledge

performance anxiety, the student denied worrying a great deal about school or

experiencing significant difficulties with regard to academics or socialization. [Id.]  Dr.

Bregman's report states:  "Diagnostically, [the student] manifests a learning disability

and a generalized anxiety disorder of mild to moderate severity.... Although it would be

a mistake to overemphasize [the student's] self-consciousness and sense of vulnerability,

11

it is equally important to provide [the student] with educational and treatment strategies that will promote adaptive growth and development." [Id.] Dr. Bregman did not observe the student in the school setting and, thus, could not testify as to how the student actually "presents in class" when anxious. [Id.] Based on testimony given by Board staff members engaged in the student's program, Dr. Bregman's recommendation that "[e]very effort should be made to plan individual and small group instruction during times of the day when major subjects are not being taught," was already an existing Board practice. [Id.; B-61, p.2; 12/17/01 Testimony of Dr. Joel Bregman]

15.    The PPT met on December 20, 2000, to review Dr. Bregman's evaluation report. [Board Exhibit 59]. It was agreed that after consultation with Dr. Bregman, the school psychologist would prepare further objectives for the IEP goal related to the development of positive self-concept. [Board Exhibit 36, p.10]

16.    The parents expressed concern that the student was removed from her regular education class on occasion for individualized instruction. [Decision, p.5 (finding #14)] The student's fourth grade regular education teacher reassured the parents that she was not permitted to teach something new when any student was out of the class for other instruction. [Id.; Board Exhibit B-61, p.2; 1/15/02 Testimony of Board fourth grade

LAW OFFICES  •  **SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC**  •  646 PROSPECT AVENUE  •  HARTFORD, CONNECTICUT 06105-4286  •  (860) 233-2141
JURIS NO. 62326

teacher; 2/07/02 Testimony of Dr. Cathryn Riggs, p.48].  Other Board personnel who

worked directly with the student testified that they were unaware of any such fear on the

part of the student. [Decision, p.5 (finding #4)]  Nevertheless, in an attempt to address the

parents' concern, the special education teacher tried briefly to meet with the student and

two others in the back of the regular education classroom for the specialized instruction,

but the student was uncomfortable and lacked the necessary attention. [Id.; 1/16/02

Testimony of Board special education teacher]  During the 2001-02 school year, the

Parents wanted to use the pullout model. [1/16/02 Testimony of Nancy McGraw, p.133]


17.  The PPT met again on March 16, 2001, to plan the student's triennial evaluation. [Board

Exhibit 61, p.5]  An individualized organization goal was added to the IEP. [Id.]  The

goal is for the Student "...to demonstrate the use of strategies to promote organization by

achieving 2 out of 3 objectives." [Id.]  The 3 objectives are:  1) "use self-monitoring

checklists, planners, or calendars to remain organized on a weekly basis;" 2) "maintain a

journal in weekly individual counseling sessions regarding time-management concerns

and solutions;" 3) "identify and verbalize feelings and needs regarding organization/time-

management/productivity and log in journal on a weekly basis." [Id.]  Roberta Dolan,

special education teacher acting as case manager, agreed to call the parents twice monthly

to review the student's program. [Id.]  The PPT also agreed to provide services from

13

Cathy Riggs as consultant contingent on the Parent's agreement, a lunch-group, and a homework notebook. [Id., p.3].

18.    On March 20, 2001, at the request of the parents, the school psychologist sent the parents a list of some strategies which would increase the efficacy of school interventions if implemented at home. [Board Exhibit 62; testimony of Board school psychologist, February 7, 2002].  These recommended strategies were:

Assist/encourage Beth to…
    …increase the frequency of positive statements and school experiences and confidence in the ability to be successful in school
    …identify and verbalize feelings and needs.
    …use role-playing situations and behavioral rehearsal to improve assertiveness in stressful situations.
    …use positive coping mechanisms (e.g., positive self-talk, perspective taking, and basic relaxation techniques [count to 10, taking deep breaths, guided imagery in which she imagines a positive and peaceful memory or place) when encountering anxious or frustrating situations.

[Board Exhibit 62]

19.    Dr. Cathryn G. Riggs, was hired by the Board as an independent consultant to review the appropriateness of the student's IEP and related services.  [2/07/02 Testimony of Dr. Riggs, p.5]  Dr. Riggs received her Bachelor's Degree from Mt. Holyoke College with a major in psychology and sociology; Master's Degree from St. Joseph's College,

14

Comprehensive Special Education Master's; Master's Degree in Public Administration from the University of Hartford; Doctorate in Education from Lesley University. [Id., pp.7-8] Dr. Riggs has taught special education in public schools and is currently an associate professor of Education at Baypath teaching undergraduate student in teacher preparation programs. [Id., pp.7-9] She also has consulted for public school districts for approximately ten years. [Id., pp.5-6] Her role in the Student's program included reviewing the IEP and the various documentation, meet with her parents, observe her in the classroom and basically look at the IEP at the time it was being provided to ensure that it was appropriate to meet the Student's needs. [Id., p.10] Dr. Riggs is amply qualified to perform such review and give recommendations accordingly, and is considered an expert witness. [Id., pp.4-10; Exhibit A] Dr. Riggs met with the student's mother on February 14 and May 22, 2001; carefully reviewed the student's educational file; interviewed Board personnel who work with the student; and observed the student in the regular education classroom, the small-group specialized instruction setting, and in the transition/movement between the two settings. [Id., pp.11-13] Dr. Riggs did not observe the student to be anxious, isolated, or withdrawn. [Id., pp.15-28, 78] The student was able to respond to directions and "auditory receptive behavior" was appropriate. [Id.] Dr. Riggs stated her opinion that implementation of the student's IEP was "closely aligned" with the recommendations of Dr. Cherkes-Julkowski. [Id., p.40] In response to

15

the mother's concern that the student was misplacing or failing to bring home paperwork, Dr. Riggs spoke to the student's regular education class and special education teacher to set up a method for the student's entire regular education class (so as to not single out the student) for monitoring homework. [Id., pp.75-77]   Dr. Riggs spoke approvingly of the Wilson reading program, calling it "a *very* systematic method," and observed nothing that would indicate the need for speech/language services. [Id., pp. 85-86]  Dr. Riggs testified that the IEP was appropriate and that the services as outlined were being delivered. [Id., p.29]

20.    The student took the Connecticut Mastery Test (CMT) in September 2000, at the beginning of the fourth grade year. [Parent Exhibit 3] CMT scores were reported in the spring of 2001. [Id.] On the math portion, the student's score was 191, indicating performance well below the statewide mathematics goal. [Id.]  Generally, students who score at this level demonstrate adequately developed computational skills, limited problem-solving and conceptual skills. [Id.] On the writing portion, the student's score was 7. [Id.]  Generally, students who score at this level produce papers which are weakly developed narratives but include some expansion of events and characters; general and specific details show evidence of organization or sequencing. [Id.]  On the reading portion, the student's score was 41, indicating that the student can comprehend, with

*LAW OFFICES* • **SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC** • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

some teacher assistance, textbooks and other materials typically used at grade four or below. [Id.]

21.    Triennial evaluation took place between March 16 and June 5, 2001. [Board Exhibits 64, 66 -67). The special education teacher found the student to be working at a grade four level in all areas of the curriculum except for written language and handwriting which were found to be below grade level standards. Nevertheless, improvement in written language was noted. [Board Exhibit 64, p.2] In the Wilson reading program, in which the student works with two other children and the special education teacher, the student was described as very attentive and anxious to answer; no off-task behaviors were noted and responses were appropriate. (Board Exhibit 64).

22.    Based on the evaluation completed by Dr. Cherkes-Julkowski on April 19, 2000, the special education teacher administered the Woodcock Johnson Tests of Achievement-R, the Woodcock Johnson Cognitive Batter-R, the Gray Oral Reading Test 3, and the Test of Written Language 3. [B-61, p.10] The student's performance on the letter-word identification and passage comprehension subtests was within the average range as compared to other children the student's age. [B-65] Analysis of the student's work attack skills indicated that the ability to identify sight vocabulary and to apply structural

LAW OFFICES  •  **SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC**  •  646 PROSPECT AVENUE  •  HARTFORD, CONNECTICUT 06105-4286  •  (860) 233-2141
JURIS NO.  62326

and phonic strategies still poses some difficulty in the test setting. [Id.] The student's

reading comprehension skills are age appropriate in the test settings as well as in the

classroom. [Id.] The student's performance on the applied problems and calculations

subtests was within the average range compared to other children the student's age. [Id.]

Appropriate strategies to solve problems were demonstrated in all four operations. [Id.]

The student's performance on the incomplete words subtest was within the average range

as compared to other children the student's age. [Id.] The student demonstrated a

stronger ability to complete the visual closure subtest, scoring slightly above the average

range on this subtest. [Id.] The student scored within the average range on all portions of

the Gray Oral Reading 3, which was administered over two separate days. [Id.;

Testimony of Roberta Dolan] It was noted that the student seemed more anxious and

talkative on the second day; reading quickly caused the student to make some careless

errors. [Id.] The student's performance on the second day may have been slightly higher

absent the student's level of anxiety. [Id.] On the Test of Written Language (TOWL) 3,

the scores for the contextual conventions, contextual language, and story construction are

derived from a story written by the student based on a picture prompt. [Id.] The student's

story illustrated the gains made this fourth grade year in spontaneous writing. [Id.] The

student demonstrated accurate use of punctuation, paragraphs, and capitalization. [Id.]

Although the student's contextual language did not include the use of compound

LAW OFFICES • **SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC** • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

sentences or conjunctions, the student's sentences were complete with adequate vocabulary development. [Id.] The student's overall writing score on the TOWL 3 was found to be within the average range as compared to other children the student's age. [Id.].

23.  The speech/language portion of the triennial evaluation was done by the Board speech/language pathologist, Ann Butterfield. [Board Exhibit 66] On the Lindamood Auditory Conceptualization Test, the student obtained a converted score of 88, two points above the recommended minimum score for fifth grade. [Id.] On the Comprehensive Test of Phonological Processing, the student obtained a standard school of 10 on the Elision subtest and a standard score of 8 on the non-word repetition subtest. [Id.] Standard scores of 7-13 are within the average range for the test. [Id.] The Phonological Awareness Test (PAT) is normed to age 9 years, 11 months. [Id.] Since the student's chronological age at the time of the triennial evaluation was 10 years, 6 months, standard scores could not be used. [Testimony of Ann Butterfield, 36-39] Therefore, the evaluator compared the raw scores obtained in testing done by Dr. Cherkes-Julkowski in April 2000, Board Exhibit 35, pp.7-8, with the raw scores obtained in April 2001 as part of the triennial evaluation. [Id.] The student demonstrated improvement in both graphemes (consonants, long and short vowels, consonant blends, consonant digraphs, r-controlled vowels, vowel

*LAW OFFICES* • **SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC** • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

digraphs, dipthongs) and decoding (VC words, CVC words, consonant digraphs, consonant blends, vowel diagraphs, r-controlled vowels, CVCe words, dipthongs). [Id.] The speech/language pathologist concluded that the student appears to be no longer in need of speech/language consultative services; the student's functioning in phonological awareness is at a level which indicates appropriate programming without these services; and the special education reading program appropriate meets the student's needs. [1/15/02 Testimony of Ann Butterfield, pp. 23-26, 40-43]

24.    In the observation done by the school psychologist, the student was seen working quietly on assignments, following teacher directions well, putting forth solid effort and demonstrating solid on-task, age-appropriate behavior. [Board Exhibit 67]  Peer relations were noted as appropriate as well as classroom behavior. [Id.]  As observed, the student was "a bit distracted at times" but the "distractibility level [did] not appear to be significant and may be considered as comparable" to peers in the class. [Id.]  The student's social/emotional functioning was assessed in March 1998 using the Behavior Assessment System for Children (BASC) (Exhibit B-13, pp. 3-4). [Id.]  A fuller report of the BASC done in 1998 was attached as part of the 2001 triennial evaluation. [Exhibit B-67, p.4]

LAW OFFICES  •  SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC  •  646 PROSPECT AVENUE  •  HARTFORD, CONNECTICUT 06105-4286  •  (860) 233-2141
JURIS NO.  62326

25.  Satisfactory progress or mastery was reported at the end of the 200-01 school year concerning the student's math skills, reading, written language skills, verbal reasoning skills, phonological awareness skills, and development of positive self-concept. [Board Exhibit B-36, pp. 5-10]  Likewise, Board staff reported that the Student progressed during the 200-01 school year. [Id.; 1/15/02 Testimony of Ann Butterfield, p. 40-43; 1/16/02 Testimony of Dr. Riggs, pp. 145-46]

26.  The goals and objectives of the IEP developed for the fifth grade, school year 2001-2002, were measurable and directly related to meeting the student's needs as a child with a learning disability. [Board Exhibit 68]  The goals and objectives proposed for the Student are as follows:

Goal #1:  [The Student] will increase her skills in reading.

Goal #2: [The Student] will increase her skills in written language.

Goal#3: [The Student] will increase her math skills

Goal#4: [The Student} will further develop a positive self-concept by achieving 6 our of 6 objectives.

Goal 5: [the Student will demonstrate the use of strategies to promote organization by achieving 3 out of 3 objectives.

*LAW OFFICES* • **SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC** • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

[Board Exhibit 68, pp.6-12, attached hereto as Exhibit B]  The PPT proposed specialized

instruction and counseling services for approximately 3 hours per week (which includes

pull out 2 hours per week) in addition to offering the student the advantage of maximum

opportunity to be involved in and progress in the general curriculum with non-disabled

peers. [Board Exhibit 68, p.13]  Testimony of all of the Board's staff demonstrated that

they are cognizant of and able to provide the support necessary to meet the student's

learning and social/emotional needs. Dr. Riggs testified that the 2001-02 IEP was

individualized and appropriate given the triennial evaluation results,  prior evaluations

and the student '00-'01 progress.


27.    It was the Board staff's understanding that the Parents accepted the goals and objectives

during the various PPT meeting, but disagreed with the placement. [1/16/03 Testimony,

pp.134-38]  In a letter to the school district, however, the Parents requested a private

school placement at Ben Bronz Academy for the 2001-02 school year. [B-71]  Their

request for the private placement was denied by the PPT because the proposed '01-'02

could provide the Student with a free appropriate public school education. [Board Exhibit

68, p.3]

LAW OFFICES  •  SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC  •  646 PROSPECT AVENUE  •  HARTFORD, CONNECTICUT 06105-4286  •  (860) 233-2141
JURIS NO. 62326

Respectfully submitted by,
NEW BRITAIN BOARD OF EDUCATION


By _____
Nicole Bernabo, Esq.
Sullivan, Schoen, Campane & Connon, LLC
646 Prospect Avenue
Hartford, CT 06105
(860) 233-2141
(860) 233-0516 facsimile
Fed.Bar No. ct19783
nbernabo@sscc-law.com

LAW OFFICES • **SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC** • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

# C E R T I F I C A T I O N

This is to certify that a copy of the foregoing Rule 9(c)(1)Statement was mailed, postage

prepaid, to Lawrence W. Berliner, Esq., Klebanoff and Phelan, P.C., 433 South Main

Street, Suite 102, West Hartford, CT 06110, this 14th day of November, 2003.


_____
Nicole A. Bernabo

LAW OFFICES • SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326