# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

B. L., individually and through her parents :
and next friends, MR. AND MRS. T.L., :
      Plaintiffs, :
           :
v. :    Civil Action No. 3:02 CV 767 (CFD)
           :
NEW BRITAIN BOARD OF :
EDUCATION, :
      Defendant. :

## RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Plaintiff B.L. ("B" or "the student"), a young girl living in the town of New Britain,

brings this action against the defendant, the New Britain Board of Education ("New Britain" or

the "Board"),[1] through her parents, ("the Ls"), acting as her next friends, and pursuant to the

United States Constitution; the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et*

*seq*. ("IDEA"); Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794

("Rehabilitation Act"); and Connecticut's special education laws, Conn. Gen. Stat. § 10-76 *et*

*seq*.[2] Specifically, the Ls appeal the decision of a due process administrative hearing officer, who

ruled that the Board offered B an appropriate educational program for the 2001-2002 school year,

and, therefore, her parents were not entitled to reimbursement for their unilateral placement of B

at a private educational academy for that school year.

---

[1] Due to the amount of confidential medical information about the plaintiff which forms part of this suit, plaintiff and her parents will be referred to by their initials throughout this ruling.

[2] The IDEA recently has been amended by the Individuals with Disabilities Education Improvement Act of 2004, Pub. L. No. 108-446, 118 Stat. 2647 (Dec. 3, 2004), which took effect on July 1, 2005. Since all of the relevant events occurred well before the passage of those statutory amendments, the citations herein refer to the pre-2004 IDEA.

The complaint alleges that the hearing officer's final decision: (1) violated B's right to receive a free appropriate public education as provided by the IDEA; (2) violated B's right to receive a free appropriate public education and other civil rights in violation of the Rehabilitation Act; (3) violated B's right to due process of the law, as secured by the Fourteenth Amendment of the United States Constitution; and (4) violated B's rights under the special education laws of Connecticut. The plaintiffs seek equitable relief in the form of a reversal of the hearing officer's decision, as well as reimbursement of the fees incurred at the private educational academy and attorney's fees.

The plaintiffs have moved for summary judgment on count four of the complaint. The Board has moved for summary judgment as to the entire complaint.

## I    Background[3]

B resides with her parents in New Britain, Connecticut, and attended New Britain Public Schools during the period encompassed by the complaint, up to and including the 2000-2001 school year. Since 1996-97, when she was in the first grade, B had been receiving remedial reading services. While B was in the second grade, her parents reported that B was having increased difficulty with simple paperwork and raised questions regarding B's attention and inconsistent academic performance. At a Planning and Placement Team ("PPT") meeting on February 23, 1998, the Board agreed to undertake the comprehensive evaluation requested by the

---

[3] The following facts are taken from the parties' summary judgment papers, Local Rule 56(a) (formerly Local Rule 9(c)) statements), and other evidence submitted by the parties. They are undisputed unless otherwise noted.

parents.[4]

A comprehensive evaluation was performed in March 1998, and it contained three separate assessments: intellectual, educational and social/emotional. The intellectual assessment suggested that B was "solidly functioning within the Average range," had a verbal scale IQ of 102, a performance scale IQ score of 106 and a full scale IQ score of 104. B's performance on verbal and nonverbal tasks indicated "even cognitive development." In the verbal area, B demonstrated a relative strength in social judgment and general common sense, as well as above average abilities in word knowledge, general fund of information, and good conceptual thinking. B demonstrated weaknesses, however, in numerical reasoning ability and perception of spatial relations.

The education assessment indicated that B was academically functioning on grade level in the areas of reading and writing, but math skills were significantly below her measured intellectual potential.

The social/emotional assessment suggested that B's externalizing behaviors were consistently within average expectations, but B's tendency to be "nervous, fearful or worried about real or imagined problems (anxiety)" was deemed clinically significant and her ability to adapt readily to changes in the environment was consistently rated with the "at-risk" range.

On April 14, 1998, a Multidisciplinary Composite Evaluation Report for Students Suspected of Being Learning Disabled was completed for B. The PPT subsequently determined

---

[4]In Connecticut, a Planning and Placement generally consists of parents, teachers, and educational specialists. The PPT meets and confers in a relatively informal, collaborative process to determine how best to accommodate the needs of a disabled student through a written individualized educational program ("IEP"). See J.C. v. Regional Sch. Dist. 10, 278 F.3d 119, 121 (2d Cir. 2002).

that there was a discrepancy between B's ability and achievement in mathematical computations and mathematical reasoning. The PPT further determined that this discrepancy was not the result of visual, hearing or motor impairment; mental retardation; emotional disturbance; environmental, cultural or economic disadvantage; or lack of motivation or opportunity to learn. The PPT concluded that the discrepancy was not correctable without special education or related services. Therefore, because B was eligible for special education and related services, an individual education plan ("IEP") was developed for her by the PPT. This IEP, which would cover the remainder of the second grade and all of third grade, called for twenty-seven hours of regular education and three hours of special education services per week for B.

On March 8, 1999, the IEP team met to review the student's progress in third grade. Although the teachers noted that the B had made both academic and social progress, there was agreement that she should continue in the special education inclusion program ("the SEI") based upon weaknesses in math skills, written language and organizational ability. The parents also indicated that they were considering keeping B in the third grade for an additional year, and the Board noted it would support that decision. In addition, B's special education services were increased to five hours per week in the IEP developed for the 1999-2000 school year.

By letter dated August 16, 1999, the parents notified the Board that they were obtaining an independent psycho-educational evaluation of B, and stated that "[w]e do agree with [B's] retention in third grade so long as [she] receives the support around [her] areas of deficit, which include learning disabilities and health impairments." The letter also stated that "a complete language evaluation of [B] is necessary as it is clear that [she] is impaired significantly in reading and writing," and that "this testing should include a look at [Bs] central auditory processing." Dr.

4

Janet Schrager performed a psycho-educational evaluation of B on July 16, 1999.[5] Dr. Schrager then issued a report detailing her evaluation of B.

In November 1999, the parents requested that an independent consultant review all of B's records, interview the parents and the Board staff, observe B throughout the school day, perform supplemental testing if necessary, and determine whether B's IEP is appropriate or requires revision. Dr. Miriam Cherkes-Julkowski was selected to conduct the independent evaluation. Dr. Cherkes-Julkowski conducted testing and interviews on April 19, 2000, and observed B in the school setting on April 28, 2000. Dr. Cherkes-Julkowski prepared a report of her evaluation shortly thereafter.

The PPT reconvened on June 1, 2000, in order to develop an IEP for the 2000-2001 school year, during which B would be in the fourth grade. At that meeting, the parents raised questions regarding some of Dr. Cherkes-Julkowski's findings and recommendations, and the Board agreed to contact Dr. Cherkes-Julkowski in order to obtain a clarification. The PPT then developed goals for B in the areas of math, reading, written language skills, verbal reasoning, phonological awareness, and developing self-concept. The PPT also agreed that "Inspiration" computer software would be used to help B organize writing tasks, direct counseling services would be added for one half-hour each week, that B's special education teacher would consult with the Board speech/language pathologist regarding intervention plans for phonemic awareness and effective formulation of curriculum language content in her verbal and written expression, and that B would be permitted extra time on all assignments and on tests as needed. On June 9, 2000, Dr. Cherkes-Julkowski provided the Board with a telephonic and written response to its

---

[5] It appears that Dr. Schrager's services were paid for by the parents, not the Board.

5

request for clarification on behalf of the parents.

On September 7, 2000, the PPT met again to discuss Dr. Cherkes-Julkowski's supplemental responses and additional questions and concerns from the parents.  At that meeting, the Board denied the parents' request for a central auditory processing evaluation because it was not mentioned in Dr. Cherkes-Julkowski's report.  Although the Board also denied the parents' request for an assistive technology evaluation, it did agree to obtain more information on such an evaluation.  The PPT referred B to Dr. Joel Bregman for a diagnostic school psychiatric consultation.  B met with Dr. Bregman on November 8, 2000, and the entire L family met with Dr. Bregman on December 5, 2000.  Dr. Bregman did not observe the student in the classroom setting.

On December 20, 2000, the PPT met to review Dr. Bregman's evaluation report.  At that meeting, it was agreed that the school psychologist, after meeting with Dr. Bregman, would prepare further objectives for the IEP goal related to the development of positive self-concept.  At that meeting, the parents also expressed concern about the amount of time B was spending outside of the classroom on specialized instruction.  B's regular education teacher responded that she was not permitted to teach something new when any student was out of the class for other instruction.  After that meeting, the special education teacher tried to meet with B and two other students receiving specialized instruction in the back of the regular education classroom, rather than in a separate office for specialized instruction. This effort was abandoned soon thereafter.

On March 20, 2001, the school's psychologist, Nancy McGraw, sent the parents a list of strategies that she suggested would increase the efficacy of B's school interventions if

implemented at home.[6]  On March 26, 2001, at another meeting of the PPT, an individualized organization goal was added to the IEP.  The goal was for B to demonstrate the use of strategies to promote organization by achieving two out of three objectives.  Roberta Dolan, the special education teacher acting as B's case manager, agreed to call the parents twice a month to review B's program.  At that meeting, the PPT also agreed to provide services from Dr. Cathy Riggs as a consultant, contingent on the parents' agreement.  Dr. Riggs was then hired by the Board as an independent consultant to review the appropriateness of B's IEP and related services.  Dr. Riggs reviewed the IEP, met with B's parents, observed B in the classroom and attempted to determine if the IEP was appropriate to meet B's needs.  Dr. Riggs met with B's mother on February 14, 2001 and May 22, 2001, reviewed B's educational records, interviewed Board personnel who worked with B, observed B in the regular educational classroom, the small-group specialized instruction setting, and in transition between the two settings.  In addition, Dr. Riggs spoke to B's regular education class and special education teacher about setting up a method for B's entire class for monitoring homework.[7]

In September 2000, at the beginning of the fourth grade, B had taken the Connecticut Mastery Test.  The scores from that test were reported in Spring 2001.  On the math portion, B's score was 191, which is below the statewide mathematics goal.  B's score on the writing portion was 184 and her score on the reading portion was 194.  Both of those scores were within the statewide grade 4 intervention level. **(See Plaintiff ex. 3)**

B's triennial evaluation occurred between March 16 and June 5, 2001.  During that

---

[6]The parents contend that these suggestions were, in fact, ineffective.

[7]This approach was intended to avoid the singling out of B.

7

evaluation, several Board employees evaluated B.  First, Roberta Dolan, B's special education

teacher, administered the Woodcock Johnson tests of achievement, the Woodcock Johnson

cognitive batter-R test, the Gray Oral reading test 3, and the test of written language 3 to the

student.  All of these tests were recommended by Dr. Cherkes-Julkowski in her April 2000

report.

Ann Butterfield, a speech/language pathologist employed by the Board, performed the

speech/language portion of the triennial evaluation.  On the Lindamood Auditory

Conceptualization Test, B obtained a converted score of eighty-eight, two points above the

recommended minimum score for fifth grade.  On the Comprehensive Test of Phonological

Processing, B obtained a standard score of ten on the Elison subtest and a standard score of eight

on the non-word repetition subtest.  Standard scores of between seven and thirteen are within the

average range for the test.  Butterfield also administered the Phonological Awareness Test

(PAT).  Because the PAT is scored to age nine years, eleven months, and B was age ten years, six

months at the time of the evaluation, the standard PAT scores could not be used at that time.

Therefore, Butterfield compared the raw scores received by B on the PAT to the raw scores

obtained by B on the PAT in April 2000, when it was administered by Dr. Cherkes-Julkowski.

The parties dispute whether this comparison demonstrated an improvement by B.

B also was evaluated by Nancy McGraw, the school psychologist, as part of the triennial

evaluation.  McGraw observed the student in the classroom setting, reporting that "[B] worked

quietly on her assignments and followed teacher directions well.  She seemed to put forth solid

effort and demonstrated solid on-task behavior during [McGraw's] observation."  Moreover,

McGraw reported that "[p]eer relations were noted as appropriate as well as general classroom

8

behavior."[8]  Finally, the Behavior Assessment System for Children was completed as part of the

triennial evaluation.

In June 2001, two PPT meetings were convened in order to develop an IEP for B for the

2001-2002 school year.  Based on the results of the triennial evaluation, the Board reported at the

PPT that B had made satisfactory progress or mastery in her math skills, reading, written

language skills, verbal reasoning skills, phonological awareness skills and development of

positive self-concept.  In sum, the Board reported that B had made appropriate educational

progress in the special education program during the 2000-2001 school year, and that it could

meet her special education needs in its educational program for the 2001-2002 school year.  The

parents disagreed with the Board's contention that B had made appropriate educational progress

during the 2000-2001 school year.

At the June 2001 PPT meetings, the Board proposed an IEP for B for the 2001-2002

school year, during which time B would be in the fifth grade.  The IEP contained proposed goals

and objectives for B, as well as the Board's recommendation for an appropriate program for B in

the New Britain public schools.  Specifically, the measurable goals proposed for B in the IEP

were to:

> (1) increase her skills in reading;
> (2) increase her skills in written language;
> (3) increase her math skills;
> (4) further develop a positive self-concept by achieving six out of six objectives; and
> (5) demonstrate the use of strategies to promote organization by achieving three out of three objectives.

(Admin. Record., Bd. Exhibit 68, pg 6-12).  In addition, the IEP contained proposed "short term

---

[8]The parties dispute the meaning of McGraw's report.

objectives/benchmarks" to help in the attainment of those measurable goals. (Id.)  The parents advised the Board that the proposed IEP would not meet B's educational needs and requested that B be placed at Ben Bronz Academy, a private special education school located in West Hartford, Connecticut.[9]  The Board denied the parents' placement request.

In a letter dated June 28, 2001, the parents wrote to the Board concerning the placement decision, stating that the letter "will serve as formal notification of the rejection of [B]'s proposed IEP as presented at the PPT on Tuesday, June 19, 2001.  This action was necessary as this program will not address the student's needs.  At this time, placement at Ben Bronz Academy was requested for [B] so that she would receive an appropriate education. [sic]"[10]  On June 30, 2001, the parents retained Karen LaRussa, a speech and language pathologist, to evaluate B's speech and language needs.  On November 28, 2001, the parents also arranged for Dr. Cherkes-Julkowski to re-evaluate B.  In a letter dated September 12, 2001, the plaintiff's parents requested a due process hearing from the State Department of Education ("DOE") in order to contest the Board's placement decision.  B's parents then placed her at the Ben Bronz Academy, and requested that the Board release her educational and other records to that school.

A) <u>The Hearing Officer's Decision</u>

The DOE assigned the request for a due process hearing to attorney Margaret Slez.  The first day of the hearing was held on October 19, 2001.  Subsequent hearings were held on October 26, 2001, November 16, 2001, December 17, 2001, January 8, 2002, January 15, 2002,

---

[9]Ben Bronz Academy is a private special education school for students with learning disabilities that has been approved by the State Department of Education.

[10]The parties dispute the meaning of the parents' letter.

January 16, 2002 and February 7, 2002.  During those hearings, both parties introduced

numerous exhibits and presented testimony from several witnesses.  The hearing officer issued a

written final decision on February 19, 2002.  In that decision, the hearing officer framed the

issues as:

> 1) Did the Board offer the student an appropriate program for the 2001-2002
> school year?
>
> 2) Are the parents entitled to reimbursement for the unilateral placement of the
> student at Ben Bronz Academy?

The hearing officer, in her findings of fact, noted that "[s]atisfactory progress or mastery was

reported for the student's math skills, reading, written language skills, verbal reasoning skills,

phonological awareness skills, and development of positive self-concept."  Final Decision and

Order, Case No. 01-310 ("Final Decision"), at 8.  Moreover, the hearing officer found:

> The goals and objectives of the IEP developed for the fifth grade, school year
> 2001-2002 . . . were measurable and directly related to meeting the student's
> needs as a child with a learning disability.  While clearly providing not
> insignificant time for specialized instruction and counseling services, the program
> offered the student the advantage of maximum opportunity to be involved in and
> progress in the general curriculum with non-disabled peers.  Testimony of Board
> personnel demonstrated that they are cognizant of and able to provide the support
> necessary to meet the student's learning and social/emotional needs.

Id.  In sum, the hearing officer found that the "IEP offered to the student was reasonably

calculated to enable the student to receive educational benefits and provide the student with an

opportunity for more than trivial advancement." Id. at 9.  Consequently, the hearing officer's

final decision and order stated:

> 1. The Board offered the student an appropriate IEP for the 2001-2002 school
> year.
>
> 2. The parents are not entitled to reimbursement for the cost of the student's

unilateral placement at Ben Bronz Academy.

Id. On March 18, 2002, B's parents requested reconsideration and clarification of the final decision from the hearing officer. On March 25, 2002, the hearing officer issued a two-page ruling on the parents' motion, which reaffirmed the conclusions of the final decision and denied the parents' request for any further consideration.

B) Procedural Background

On May 3, 2002, the Ls, acting on behalf of B, brought this action seeking a reversal of the hearing officer's final decision, reimbursement of educational expenses and an award of the costs associated with B's placement at the Ben Bronz Academy and attorney's fees.[11]  Both parties have since moved for summary judgment.

## II    IDEA Challenge

Count one of the complaint alleges that the final decision of the hearing officer violated B's right to receive a free appropriate public education as provided by the IDEA.  In its motion for summary judgment, the Board contends that there are no procedural violations of the IDEA that would support the reversal of the hearing officer's decision, and that the 2001-2002 program proposed for B was reasonably calculated to enable B to receive the necessary educational benefit.

A) The IDEA

---

[11]Generally, any party that is aggrieved by the final decision of a due process hearing officer may bring an action in the district court.  See 20 U.S.C. § 1415(i)(2)(A).  The parties file the administrative record, along with supplemental evidence, if desired, and the case is decided by the court on the preponderance of the evidence in that record. See 20 U.S.C. § 1415(i)(2)(B); M.S. v. Board of Educ. of the City Sch. Dist. of the City of Yonkers, 231 F.3d 96, 102 (2d Cir. 2000).

The IDEA represents "an ambitious federal effort to promote the education of handicapped children." Board of Educ. v. Rowley, 458 U.S. 176, 179 (1982).  More specifically:

> The IDEA provides federal remuneration for state education of disabled children, provided the responsible state has established a program that complies with federal law and regulation.  Among other things, a state receiving federal assistance must adhere to certain federal standards in evaluating potentially disabled students, see 20 U.S.C. §§ 1412(a)(7), 1414; 34 C.F.R. §§ 300.530-536, and must set up various procedural mechanisms through which parents or education planners may raise problems that arise in the child-placement process, see 20 U.S.C. § 1415; C.F.R §§ 300.500-529.  An important component of the required procedural safeguards is the availability of an opportunity for parents to present complaints at an impartial hearing - often called a "Due Process Hearing." 20 U.S.C. § 1415(b)(6).

> Connecticut participates in the IDEA.  Its federally compliant evaluation process is set forth at Connecticut Agencies Regulations § 10-76d-9.  The process for initiating and conducting a Due Process Hearing is set forth at Connecticut Agencies Regulations §§ 10-76h-1 to 10-76h-18.

P.S. v. Brookfield Bd. of Educ., 353 F. Supp.2d 306, 309 (D.Conn. 2005).  "The IDEA is a comprehensive statute enacted to ensure that all children with disabilities have access to a free appropriate public education . . . designed to meet their unique needs." Murray v. Montrose County School District RE-1J, 51 F.3d 921, 925 (10th Cir. 1995).  What constitutes a free appropriate public education is determined on a case-by-case basis, pursuant to procedures established by the IDEA.  Rowley, 458 U.S. at 181-82.  Therefore, the IDEA requires that each child receive an individualized education program ("IEP"), which is intended to be "the result of collaborations between parents, educators, and representatives of the school district." Lillbask ex rel. Mauclaire v. State of Connecticut Dept. of Educ., 397 F.3d 77, 81 (2d Cir. 2005) (quoting Murphy v. Arlington Cent. Sch. Dist. Board of Educ., 297 F.3d 195, 197 (2d Cir. 2002)).  The IEP is the "centerpiece of the IDEA's education delivery system," and it "sets out the child's

13

present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." Murphy, 297 F.3d at 197. Specifically, an IEP must state:

> (1) the child's present level of educational performance; (2) the annual goals for the child, including short-term instructional objectives; (3) the specific educational services to be provided to the child, and the extent to which the child will be able to participate in regular educational programs; (4) the transition services needed for a child as he or she begins to leave a school setting; (5) the projected initiation date and duration for proposed services; and (6) objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998) (citing 20 U.S.C. § 1401(a)(20)). While the IEP does not have to maximize the child's educational potential, it must provide "meaningful" opportunities and the possibility for more than "trivial advancement." Id at 130.

B) Standard of Review

_____ "The responsibility for determining whether a challenged IEP will provide a child with an appropriate public education rests in the first instance with administrative hearing and review officers. Their rulings are then subject to 'independent' judicial review." Walczak, 142 F.3d at 129. This review is not unlimited, however, as the IDEA specifically provides that a district court: "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B); see also Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 380 (2d Cir. 2003). As the Second Circuit has explained:

14

> [T]he role of the federal courts in reviewing state educational decisions under the IDEA "is circumscribed." Muller v. Committee on Special Educ., 145 F.3d 95, 101 (2d Cir.1998). Such decisions are subject to "independent" judicial review, Rowley, 458 U.S. at 205, 102 S. Ct. 3034, but this "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review," id. at 206, 102 S.Ct. 3034.  To the contrary, a federal court is required to give "due weight" to the rulings of a local or state administrative hearing officer, id., mindful that the judiciary generally "lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy," id. at 208, 102 S. Ct. 3034 (internal quotation marks omitted); accord Muller, 145 F.3d at 101-02; Walczak, 142 F.3d at 129.  Judicial deference "is particularly appropriate when ... the state hearing officers' review has been thorough and careful."

M.C. ex rel Mrs. C v. Voluntown Bd. of Educ., 226 F.3d 60, 66 (2d Cir. 2000).  Keeping that limited standard of review in mind, the Court now turns to the merits of the plaintiffs' IDEA challenge to the hearing officer's final decision.[12]

C) Discussion

When, as here, the parents of a disabled child file suit under IDEA to challenge a proposed IEP, and when the relief they seek includes reimbursement of expenses incurred at a private school, an award will be entered in their favor if it appears (1) that the proposed IEP was inadequate to afford the child a free appropriate public education, and (2) that the private

---

[12]In addition, the Court notes that "summary judgment appears to be the most pragmatic procedural mechanism in the Federal Rules for resolving IDEA actions. . . . The inquiry, however, is not directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed." A.S. ex rel. Mr. and Mrs. S v. Norwalk Bd. of Educ., 183 F.Supp.2d 534, 539 (D.Conn. 2002) (quoting Wall v. Mattituck-Cutchogue Sch. Dist., 945 F.Supp. 501, 508 (E.D.N.Y. 1996)); see also P.S. v. Brookfield Bd. of Educ., __ F.Supp.2d __, __, 2005 WL 839893 (D.Conn. Apr. 11, 2005) ("Summary judgment motions are often the procedural vehicle by which IDEA claims are decided, even though what the court actually does is conduct a review of the administrative record"); J.R. v. Board of Educ. of the City of Rye, 345 F.Supp.2d 386, 394 (S.D.N.Y. 2004) ("IDEA actions in federal court generally are resolved by examination of the administrative record in a summary judgment procedural posture").

education services obtained by the parents were appropriate to the child's needs.  <u>Florence County Sch. Dist. Four v. Carter</u>, 510 U.S. 7, 12-14 (1993); <u>School Comm. of Burlington v. Department of Educ. of Mass.</u>, 471 U.S. 359, 370 (1985); <u>M.C. ex rel Mrs. C v. Voluntown Bd. of Educ.</u>, 226 F.3d 60, 66 (2d Cir. 2000); <u>Walczak</u>, 142 F.3d at 129.  Thus, "[p]arents dissatisfied with a school board's proposed placement of their child may, at their own risk, unilaterally place their child in a private school.  Such action is at their own risk in the sense that they are 'entitled to reimbursement only if a federal court concludes *both* that the public placement violated IDEA and that the private school placement was proper under the Act." <u>Brookfield Bd. of Educ.</u>, 353 F. Supp.2d at 309.  The pending motions center only on the first factor–namely, the propriety of the hearing officer's determination that the IEP proposed by the Board for the 2001-2002 school year would provide B with a free appropriate public education.

       1) Adequacy of the 2001-2002 IEP

       Two issues are relevant to a federal court's review of the adequacy of a challenged IEP: (1) whether the state complied with the procedural requirements of IDEA, and (2) whether the challenged IEP was reasonably calculated to enable the child to receive educational benefits.  <u>Rowley</u>, 458 U.S. at 206-07; <u>Walczak</u>, 142 F.3d at 129; <u>A.S., ex rel P.B.S. v. Board of Educ. of the Town of West Hartford</u>, 245 F. Supp. 2d 417, 426 (D.Conn. 2001).  The plaintiffs concede that their request to the Board for private placement in the Ben Bronz Academy was not predicated on a procedural violation of the IDEA, **(Reply brief, p. 5)** and they have not alleged any such violation in their summary judgment papers.  To the contrary, in this action they challenge the adequacy of the decision made by the hearing officer in accordance with the procedures of the IDEA.  Consequently, the Court's inquiry is limited to the second consideration

relevant to this type of action–whether the challenged IEP was "reasonably calculated to enable the child to receive educational benefits." Id; see also Phillip and Mary Banks, ex rel. Phillip Banks v. Danbury Bd. of Educ., 238 F. Supp.2d 428, 432 (D.Conn. 2003) ("Because the plaintiffs do not contend that the Board failed to comply with the procedures set forth in the IDEA, the only issue to be resolved regarding this appeal is whether the proposed IEP is reasonably calculated to enable [the student] to receive educational benefits").

The "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP. The Supreme Court, however, has specifically rejected the contention that the appropriate education mandated by IDEA requires states to maximize the potential of handicapped children. . . . The purpose of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." Walczak, 142 F.3d at 130 (internal citations and quotations omitted). Thus, a State satisfies the free appropriate public education standard "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." Rowley, 458 U.S. at 203. "[F]or an IEP to be reasonably calculated to enable the child to receive educational benefits . . . it must be likely to produce progress, not regression." M.S. ex rel. S.S. v. Board of Educ. of the City School Dist. of the City of Yonkers, 231 F.3d 96, 103 (2d Cir. 2000) (citations and quotation marks omitted). Therefore, a reviewing court must "examine the record for any 'objective evidence' indicating whether the child [was] likely to make progress or regress under the proposed plan." Walczak, 142 F.3d at 130 (quoting Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1121 (2d Cir.1997)); Banks v. Danbury Bd. of Educ., 238 F. Supp.2d at 432. Factors such as the attainment of passing grades

17

and regular advancement from grade to grade are generally accepted indicators of satisfactory

progress.  Walczak, 1423 F.3d at 130; Banks v. Danbury Bd. of Educ., 238 F. Supp.2d at 432.

This is true even when the student has been educated in special education classes.  Walczak, 1423

F.3d at 130.

      Here, there is sufficient "objective evidence" in the record that B had progressed under

prior IEPs, and that the IEP proposed for the 2001-2002 school year would have provided B with

a free appropriate education.  For example, Butterfield, the speech/language pathologist

employed by the Board, testified about the consultative services she had provided to B during the

2000-2001 school year, as well as testing she had conducted on B for the triennial evaluation.

According to B's IEP for 2000-2001, Butterfield was to provided fifteen minutes a week in

consultative services on phonemic awareness and in effective formulation of curriculum

language content in B's verbal and written expressions.  In April 2001, as part of B's 2001

triennial evaluation, Butterfield evaluated B and administered several tests.  Butterfield testified

before the hearing officer that B scored within the average ranges on several tests, and that her

scores were improvements on the scores she received in testing by Dr. Cherkes-Julkowski from

April 2000.  (Admin Record., Jan. 15, 2002, pg. 20).  More specifically, on the Lindamood

Auditory Conceptualization Test, B obtained a converted score of eighty-eight, two points above

the recommended minimum score for fifth grade.  On the Comprehensive Test of Phonological

Processing ("the CTPP"), the student obtained a standard score of ten on the Elison subtest and a

standard score of eight on the non-word repetition subtest.  Standard scores of between seven and

thirteen are within the average range for the CTPP.  On the Phonological Awareness Test (PAT),

B received scores that were higher that those she received when she had previously taken the

PAT for Dr. Cherkes-Julkowski in April 2000.[13]  All of the tests conducted by Butterfield were

recommended by Dr. Cherkes-Julkowski.  In her report from that evaluation, Butterfield

concluded that she no longer needed to provide consultative services to B because her

"functioning at phonological awareness is at a level which indicates appropriate programing

without these support services.  The special education reading program appropriately meets her

needs." (Admin. Record, Bd. Exhibit 66)[14]  Before the hearing officer, Butterfield testified that

her recommendation at the June 2001 PPT meetings was that B no longer required any more

consultative services because B "obviously made great gains and my participation was really no

longer necessary." (Id. at 26).

        B's fourth grade regular education teacher, Krista Shepard, also testified before the

hearing officer.  Although not extensively discussed by the hearing officer in the final report, the

Court notes that Shepard testified on numerous aspects of B's performance during her year in the

---

        [13]PAT scores are normed to age nine years, eleven months.  Since B was ten years, six
months at the time of the evaluation, the standard PAT scores could not be used.  Therefore,
Butterfield compared the raw scores to the raw scores obtained by B in testing conducted by Dr.
Cherkes-Julkowski in April 2000.

        [14]B received lower scores on the same tests when they were administered by LaRussa
after the Board had proposed the 2001-2002 IEP. At the due process hearing, Butterfield testified
that this difference could be accounted for by the fact that B may have been more relaxed at the
time of testing because Butterfield knew B from prior interaction at the school, B knew the
testing environment at the school and Butterfield allowed B to break the tests into different
sittings.  (Admin. Record, January 15, 2002, pg. 22). Butterfield also testified that LaRussa
improperly administered only portions of some tests, rather than the whole tests, which led to
incomplete results.  See footnote 18 *infra*.
        Butterfield offered a similar explanation of the difference between the scores she recorded
and the scores Dr. Cherkes-Julkowski recorded in November 2001, which was significantly more
pronounced that the difference between Butterfield's and LaRussa's scores. (Admin Record,
January 15, 2002, pg. 47). Because Dr. Cherkes-Julkowski's scores were recorded in November
2001, well after the 2001-2002 IEP was proposed and rejected, and after B was placed in a
private educational academy, it was not considered by the hearing officer.

fourth grade, concluding that: "I thought [B] was a very mature young lady who was definitely ready for fifth grade. Everybody has areas that they need to improve on. I did not see her as anywhere under or below average in a sense that she would need to worry about her skills for fifth grade." (Admin. Record, January 15, 2002, pg. 138).

B's special education teacher, Roberta Dolan, also testified before the hearing officer. Dolan testified that she had been working with B for three and a half years in the New Britain public school system. During the 2000-2001 school year, Dolan would work with B for one and a half hours in the regular education classroom per week, and three and a half hours per week in her own office with two other children. During that time in her office, Dolan would work with B on the Wilson reading program, "a code based reading program to help children with phonological awareness skills, decoding, and encoding words. To assist them when they apply that to actual reading of the text." (Admin. Record, January 16, 2002, pg. 9, 12). During B's triennial evaluation, Dolan administered the Woodcock Johnson tests of achievement, the Woodcock Johnson cognitive batter-R test, the Gray Oral reading test 3, and the test of written language 3. These tests were chosen at the March 16, 2001 PPT, and they were based upon the April 2000 evaluation performed by Dr. Cherkes-Julkowski. In her report for the triennial evaluation, Dolan stated that "[B] is working at a grade four level in all areas of the curriculum. Written language and handwriting are below grade level stand[ards], however, her written language has improved." (Admin. Report, Bd. Exhibit 64, pg. 2; see also Final Report, pg. 6-7). In regard to the Wilson reading program, Dolan described the student as "very attentive" and "anxious to answer," and that "no off task behaviors [were] noted." (Id.) Before the hearing officer, Dolan testified that:

20

> My overall assessment would be that she made good progress. I felt that in the Wilson Reading Program, she was beginning to learn skills that she would eventually be able to apply on her own to independent reading, reading within the classroom, and I saw that as a very positive thing. In terms of the other areas of the curriculum, I felt that she still needed support, but that she was doing well. I was personally, in terms of my goals with this–with any of my students, I would say that I was pleased with how she was doing.

(Admin. Record, Transcript January 16, 2002, pg. 42-43).

The psychologist at B's school, Nancy McGraw, also testified at the due process hearing. McGraw first evaluated B in 1999, at which time she found her "intellectual functioning to be within the average range." (Admin. Record., January 16, 2002, pg. 240). During the 2000-2001 school year, McGraw met with B for a half hour per week for direct counseling services on the issues of organization and self-esteem. (Id. at 243). McGraw also observed B in the classroom setting during alternating weeks throughout the school year. Before the hearing officer, McGraw testified that B had weak self-esteem, had appropriate social skills, and that B actively participated during the times McGraw visited her classroom.

Dr. Cathy Riggs also testified before the hearing officer.[15] As noted previously, Dr. Riggs was hired by the Board as an independent consultant to review the appropriateness of B's IEP and related services in early 2001. More specifically, Dr. Riggs reviewed the 2000-2001 IEP, met with B's parents, observed B in the classroom on two separate occasions[16] and attempted to determine whether the IEP was appropriate to meet B's needs. Dr. Riggs met with B's mother on

---

[15]Dr. Riggs received a Doctorate in Education. Because the hearing officer referred to the witness as Dr. Riggs in the final report, the Court will do likewise.

[16]Dr. Riggs returned for a second observation because she "felt that I should go back a second time in part because what I saw the first time was not particularly remarkable in that there was nothing particularly outstandingly different about her performance. So I went back a second time to the classroom." (Admin. Record, February 7, 2002, pg. 23-24).

February 14, 2001 and May 22, 2001, reviewed B's educational records, interviewed Board personnel who worked with B, observed B in the regular educational classroom, the small-group specialized instruction setting and in the transition between the two settings.  In addition, Dr. Riggs spoke to B's regular education class and special education teacher about setting up a method for B's entire class for monitoring homework.  Before the hearing officer, Dr. Riggs testified that, as a result of her evaluation of B, her "opinion was that the services as outlined [in the 2000-2001 IEP] were being delivered." (Admin. Record., February 7, 2002, pg. 29).  Dr. Riggs also testified that the IEP was "closely aligned to the recommendations from Dr. Cherkes-Julkowski" and that "[B's] continued work with Ms. McGraw addressed" the social/emotional anxiety issues raised by Dr. Bregman's report. (Id. at 40).[17]

The plaintiffs claim, however, that the hearing officer improperly disregarded Dr. Cherkes-Julkowski's re-evaluation of B in November 2001, which they claim supports a finding that the 2001-2002 IEP failed to provide B with a free appropriate public education. **(Opp. Mem. 4, 5,; brief 10)** The Board maintains that the hearing officer appropriately discounted Dr. Cherkes-Julkowski's re-evaluation. **(Brief, 14-15)**  Dr. Cherkes-Julkowski first evaluated B in April 2000.  This evaluation consisted of testing and an interview of B on April 19, 2000, and observation of B in the school setting on April 28, 2000.   Dr. Cherkes-Julkowski's report from this evaluation was utilized in the development of the IEP for B's 2000-2001 school year.[18]  At

---

[17]As the parents' attorney brought out on cross-examination, however, Dr. Riggs' focus was on whether the IEP as written was being implemented, and not whether the written IEP was appropriate. (Id. at 38).

[18]Although not given great weight by the hearing officer, both parties concede that Dr. Cherkes-Julkowski's April 2000 report was considered by the hearing officer when reaching her final decision.

the parents' request, Dr. Cherkes-Julkowski re-evaluated B in November 2001.  This re-evaluation occurred after the 2001-2002 IEP had been proposed by the Board and rejected by the parents, and after the parents had requested a due process hearing and placed B in the Ben Bronz Academy.  Consequently, the hearing officer concluded that, "[s]ince the appropriateness of the [2001-2002 IEP] must be considered in light of information available to the PPT at the time the IEP was developed [in June 2001], the report of the re-evaluation by Dr. Cherkes-Julkowski is disregarded for the purpose of this [final] decision." Final Report, at p. 4.  Because Dr. Cherkes-Julkowski's re-evaluation was conducted after all of the pertinent events in this case, and, most importantly, after B already had received several month's instruction at the Ben Bronz Academy, the Court finds that its exclusion was proper. See, e.g., Fuhrmann v. East Hanover Bd. of Educ., 993 F.2d 1031, 1040 (3d Cir. 1993) ("the measure and adequacy of an IEP can only be determined as of the time it is offered to the student, and not at some later date . . . Neither the statute nor reason countenance 'Monday Morning Quarterbacking' in evaluating the appropriateness of a child's placement"); Pitchford ex rel. M v. Salem-Keizer School Dist. No. 24J, 155 F.Supp.2d 1213 (D.Oregon 2001) ("IEP's are not to be judged in hindsight, based on the progress enjoyed by the child, but based instead on the IEP's 'goals and goal achieving methods at the time the plan was implemented'")(quoting Adams v. State of Oregon, 195 F.3d 1141, 1149 (9th Cir. 1999)).

The parents next challenge the hearing officer's "fail[ure] to even discuss Karen LaRussa's evaluation report or her testimony." **(Opp. Mem. 10)**  The Board claims that the hearing officer properly discounted LaRussa's testimony and report because she had failed to observe B in the educational setting and she lacked any practical understanding of the proposed

23

IEP.  In addition, the Board claims that LaRussa's report was irrelevant to the issue before the hearing officer because her evaluation of B occurred after the IEP had been proposed and after B's parents had withdrawn her from the public school system.  **(Brief p. 14; opp. memo p. 8).**

The Court agrees with the plaintiffs that the hearing officer's final report is devoid of any mention of LaRussa and her evaluation of B.  As the Board correctly contends, however, a hearing officer has discretion to weigh the conflicting testimony of the parties' respective witnesses.  See Gozales v. Puerto Rico Dept. of Educ., 254 F. Supp.2d 350, 352 (1st Cir. 2001); Douglas W. v. Greenfield Public Schools, 164 F. Supp.2d 157, 169 (D.Mass. 2001).  In their motion for reconsideration of the final decision, the parents claimed that the hearing officer erred by not considering, inter alia, the testimony of LaRussa.  In the ruling on that motion, the hearing officer indicated that "[a]ll such oral, documentary and other tangible evidence was considered by the hearing officer in the course of weighing the evidence and writing the final decision and order."  Because LaRussa's evaluation did not occur until after the IEP had been proposed, and it did not include an observation of B in the educational setting, the hearing officer had the discretion to discredit LaRussa's testimony on the issue before her–whether the IEP for the 2001-2002 school year would provide B with a free appropriate public education.[19]  Indeed, the Court notes LaRussa begins her report by stating that "[B] was referred to me for an independent Speech and Language Evaluation by her parents as part of the admission requirements for Ben

---

[19]In addition, the hearing officer heard testimony from Ann Butterfield, one of the Board's witnesses, that LaRussa only administered certain sub-tests of the CELF test, and not the whole test.  According to Butterfield, this created scores that were taken out of context, as a student should be given all of the sub-tests, and the educator should draw conclusions from the entire result, not just from isolated sub-tests.  (Admin. Record, January 15, 2002, pg 53-59). If accepted by the hearing officer, this testimony would further buttress her decision to discount LaRussa's testimony.

Bronz Academy in September 2001." (Admin. Record, P. Exhibit 10, pg 1). In addition, the last page of LaRussa's report indicates that copies were sent only to B's parents, the Ben Bronz Academy and B's attorney and, by omission, not to the Board or any of its employees.

The plaintiffs also argue that the hearing officer improperly failed to credit the testimony of Dr. Susan Sharpe, who is the Director of the Ben Bronz Academy. As noted previously, however, "the measure and adequacy of an IEP can only be determined as of the time it is offered to the student, and not at some later date." Fuhrmann, 993 F.2d at 1040. Consequently, because Dr. Sharpe's testimony solely concerned B's performance at the Ben Bronz Academy *after* the 2001-2002 IEP had been proposed and rejected, and *after* B had been unilaterally removed from the New Britain public school system and placed at Ben Bronz Academy, the hearing officer acted within her discretion when declining to give it any weight.

Finally, the plaintiffs claim that the hearing officer "completely garbled" the testimony given by Dr. Bregman, a psychiatrist, and had it state "the opposite of what the witness had recommended." **(P's opp. Memo, pg. 7)**. In essence, the plaintiffs claim that although Dr. Bregman testified that B should be placed in a small structured program if her needs could not be met in the mainstream class because of her anxiety and difficulties with self-confidence, the hearing officer "found that [Dr. Bregman] had effectively endorsed defendant's program and placement."

In the final report, the hearing officer noted that Dr. Bregman reported that B was "energized, restless, and fidgety, particularly during open-ended discussions and conversations" and "endorsed a significant number of symptoms reflecting performance, anticipatory, and social anxiety on a self-report checklist (the Revised Children's Manifest Anxiety Scale)." (Final

25

Report, pg. 5).  Thus, the hearing officer also quotes Dr. Bregman as concluding:

"Diagnostically, the student manifests a learning disability and a generalized anxiety disorder of

mild to moderate severity . . . Although it would be a mistake to overemphasize the student's

self-consciousness and sense of vulnerability, it is equally important to provide the student with

educational and treatment strategies that will promote adaptive growth and development." (Id).

The hearing officer then concluded that, *"[b]ased on testimony given by Board staff members*

engaged in the student's program, Dr. Bregman's recommendation that 'every effort should be

made to plan individual and small group instruction during times of the day when major subjects

are not being taught' was already an existing Board practice." (emphasis added).  After reviewing

the final report, as well as Dr. Bregman's testimony at the due process hearing on January 15,

2002, the Court finds that the hearing officer did not misinterpret Dr. Bregman's testimony, as

claimed by the plaintiffs.  To the contrary, it appears that the hearing officer, based on the

testimony given by other witnesses presented by the Board, found that Dr. Bregman's

recommendations were properly being implemented by the Board.

Having reviewed the evidence in the record, and giving "due weight" to the hearing

officer's final decision, the Court finds that there was sufficient evidence that the IEP proposed

by the Board for the 2001-2002 school year was reasonably calculated to enable B to receive

educational benefits.  Rowley, 458 U.S. at 206-07.  The testimony of B's teachers, and the

evidence of the results from the triennial evaluation, provided objective evidence of her progress

under the prior IEP.  See Walczak, 142 F.3d at 130 ("[T]he attainment of passing grades and

regular advancement from grade to grade are generally accepted indicators of satisfactory

progress.");  Mather v. Hartford Sch. Dist., 928 F.Supp. 437, 446 (D.Vt. 1996) ("Grades,

26

socialization skills, level of participation, consistency of effort and commitment to studies are all relevant in determining whether the whole individual has progressed in his or her education"). Moreover, there was objective evidence that the IEP proposed for 2001-2002 school year had adequate goals and programs for B, and that the New Britain public school system provided an adequate environment for achieving those goals.  Consequently, the Court grants the Board summary judgment on count one of the complaint.


**IV    Remaining Claims**

The plaintiffs also have asserted claims under the Rehabilitation Act, the U.S. Constitution and Connecticut state law.  These claims, which are subject to the parties' motions for summary judgment, are subject to the traditional summary judgment standard employed by district courts.[20]

A) <u>Standard of Review</u>

In a summary judgment motion, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56; <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986). A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986 ) (quoting Fed. R. Civ. P.

_____

[20]<u>See</u> <u>J.R. v. Board of Educ. of the City of Rye</u>, 345 F. Supp.2d at 394 ("IDEA actions in federal court generally are resolved by examination of the administrative record in a summary judgment procedural posture. . .  An IDEA action, however, differs from an ordinary summary judgment motion because the existence of a disputed issue of material fact will not defeat the motion")(internal citation omitted).

56(c)).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson</u>, 477 U.S. at 248.  After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate.  <u>Celotex</u>, 477 U.S. at 323.

      B) <u>Count Two - Rehabilitation Act Claim</u>

      Count two alleges that the final decision of the hearing officer violated B's rights under the Rehabilitation Act, 29 U.S.C. § 794.  In its motion for summary judgment, the Board argues that this claim is redundant, and that the plaintiffs have failed to set forth any evidence supporting such a claim.  The plaintiffs failed to address these arguments in their memorandum in opposition to the Board's motion for summary judgment.[21]

> Section 504 of the Rehabilitation Act provides:
>
> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

29 U.S.C. § 794 (a). Thus, while the IDEA is phrased in terms of a state's affirmative duty to

---

[21]The failure of the non-movant to oppose a motion for summary judgment does not compel this Court to grant the movant's motion. <u>See</u> Fed. R. Civ. P. 56(e) ("If the adverse party does not so respond, summary judgment, *if appropriate*, shall be entered against the adverse party" [emphasis added]); <u>Vermont Teddy Bear Co. v. 1-800 Beargram Co.</u>, 373 F.3d 241, 243 (2d Cir. 2004) ("[T]he failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment. Instead, the district court must assess whether the moving party has fulfilled its burden of demonstrating that there is no genuine issue of material fact and its entitlement to judgment as a matter of law").

provide a free appropriate public education, § 504 is worded as a negative prohibition against

disability discrimination in federally funded programs.  Smith v. Robinson, 468 U.S. 992, 1016

(1984); W.B. v. Matula, 67 F.3d 484, 492 (3d Cir. 1995).  "Based on this distinction, courts have

found that, in order to establish a section 504 violation, a plaintiff must demonstrate bad faith or

gross misjudgment in addition to the denial of a [free appropriate public education]."  A.W. ex

rel. Ms C. v. Marlborough Co. and Portland Healthcare Inc., 25 F. Supp.2d 27, 31-32 (D.Conn.

1998) (citing cases).

 In regard to count one of the complaint, the Court concludes that the hearing officer

properly concluded that the Board offered B a free appropriate public education.  Consequently,

because a Rehabilitation Act claim in this context must be founded upon the denial of a free

appropriate public education, the Board is entitled to summary judgment as to count two as well.

In addition, even if this Court's conclusion concerning the free appropriate public education is

erroneous, the Board nevertheless would be entitled to summary judgment on count two because

the plaintiffs have failed to demonstrate a genuine issue of material fact as whether the Board

acted in bad faith or engaged in gross misjudgment.  See Id. (granting summary judgment for the

school board on the plaintiff's Rehabilitation Act claim because the plaintiff did "not allege

discrimination on the basis of his disability, but instead simply challenges the adequacy of his

[free appropriate public education]").

 Consequently, the Court grants the Board summary judgment on count two.

 C) Count Three - Fourteenth Amendment Claim

 In count three, the plaintiffs allege that "the final decision of the due process hearing

officer has violated [B's] right to due process of the law as secured by the Fourteenth

Amendment of the U.S. Constitution."  The Board moves for summary judgment on count three, arguing that the plaintiffs have failed to state a legally cognizable claim.  The plaintiffs maintain that there are genuine issues of material fact as to whether her due process rights were violated.

The Fourteenth Amendment of the U.S. Constitution provides, in relevant part, that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."  "Because the Amendment is directed at the States, it can be violated only by conduct that may be fairly characterized as 'state action.'" Lugar v. Edmonson Oil Co., 457 U.S. 922, 923-24 (1982).[22]  The Fourteenth Amendment's protection of "due process" has both procedural and substantive elements.  See, e.g., Erwin Chemerinsky, Constitutional Law: Principles and Policies § 7.1, pg. 523-25 (2d ed. 2002).  The complaint merely states that B's due process rights were violated, and fails to specify whether this challenge incorporates the procedural or substantive elements of the Fourteenth Amendment, or both.  Because the plaintiffs' motion for summary judgment is limited to count four, it too fails to reveal what the proper basis is for count three.  In their memorandum in opposition to the Board's motion for summary judgment, however, the plaintiffs argue that "the Court may find that there is a disputed issue of material fact as to whether [B's] *procedural* due process rights [were] violated as alleged in the complaint." **(Reply brief, p. 3).**  Consequently, the Court finds that count three is limited to a procedural due process claim.

_____

[22]The Court finds that the plaintiff's due process claim is brought directly under the Fourteenth Amendment, and not pursuant to 42 U.S.C. § 1983.  See generally Lugar, 457 U.S. 922 (discussing the "state action" requirement for claims brought pursuant to the Fourteenth Amendment, and the "under color of state law" requirements for Fourteenth Amendment claims brought through § 1983).  This finding is supported by the fact that the complaint does not reference § 1983; does not seek damages pursuant to § 1983, and named the Board itself, rather than any municipal official, as defendants in this action.

1) Procedural Due Process

As noted previously, the Fourteenth Amendment protects against the deprivation of "life, liberty, or property" without due process of law.  Although the plaintiffs have failed to specify which aspect of that protection they are proceeding under, they do contend that it was B's free appropriate public education that was deprived without due process.  Thus, the Court finds that it is the "property" aspect of that protection which is implicated in the present case.  See Conn.Const. Art. VIII s 1 ("There shall always be free public elementary and secondary schools in the state. The general assembly shall implement this principle by appropriate legislation"); Goss v. Lopez, 419 U.S. 565, 95 S. Ct. 729, 42 L. Ed.2d 725 (1975) (finding student had a property right to education during period of school suspension under Ohio's statutes).

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Mathews v. Eldridge, 424 U.S. 319, 332, 96 S. Ct. 893, 47 L. Ed.2d 18 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552, 85 S. Ct. 1187, 14 L. Ed.2d 62 (1965)).  "In order to sustain an action for deprivation of property without due process of law, a plaintiff must first identify a property right, second show that the state has deprived him of that right, and third show that the deprivation was effected without due process." Local 342, Long Island Pub. Serv. Employees v. Town Bd. of the Town of Huntington, 31 F.3d 1191, 1194 (2d Cir. 1994) (quotations omitted; emphasis omitted).  "The Supreme Court has identified two types of procedural due process challenges: first, a challenge based on a state's regulations or procedures; and second, a challenge based on unauthorized, random acts of state employees." M.H. v. Bristol Bd. of Ed., 169 F. Supp.2d 21, 33 (D.Conn. 2001) (citing Hudson v. Palmer, 468 U.S. 517, 532 (1984)).  Rather than challenge Connecticut's statutes and procedures

31

covering IDEA cases generally, count three challenges the specific IEP proposed by the Board for the 2001-2002 school year. Consequently, the Court construes it as the second type of challenge identified above. See Id. (construing a free appropriate public education challenge in a similar manner). In such a challenge, "the Due Process Clause of the Fourteenth Amendment is not violated ... so long as the State provides a meaningful postdeprivation remedy." Hellenic Amer. Neighborhood Action Comm. v. City of New York, 101 F.3d 877, 880 (2d Cir. 1996); M.H. v. Bristol Bd. of Ed., 169 F. Supp.2d at 33. In other words, because the State cannot remedy a violation of the IDEA until it occurs, a post-deprivation remedy is the only remedy that the State can reasonably be expected to provide. M.H. v. Bristol Bd. of Ed., 169 F. Supp.2d at 33; BD v. DeBuono, 130 F. Supp.2d 401, 434 (S.D.N.Y. 2000); Simmons v. Chemung County Dep't of Soc. Servs., 770 F. Supp. 795, 799 (W.D.N.Y. 1991))

In M.H. v. Bristol Bd. of Ed., the plaintiff alleged, inter alia, that the defendant board of education and various board employees had denied their son his interest in a free appropriate public education, without due process of law. Prior to initiating their action in the District Court, the parents of the plaintiff had requested, and received, two due process hearings. Consequently, in their motion for summary judgment, the defendants argued that, because the plaintiff parents requested and received a due process hearing to determine whether the plaintiff was receiving a free appropriate public education, they had received all the due process available to him. The court agreed with the defendants, finding that the plaintiff received appropriate post-deprivation remedies in the form of the two due process hearings, and, therefore, the defendants "afforded the plaintiff all the process that was due to him under the Due Process Clause." M.H. v. Bristol Bd. of Ed., 169 F. Supp.2d at 33.

Similarly, in this case B's parents claim that the 2001-2002 IEP proposed by the Board deprived B of a free appropriate public education. After rejecting that IEP, B's parents requested, and received, a due process hearing to contest the proposed IEP and the Board's subsequent refusal reimburse them for the costs they incurred by placing B in the Ben Bronz Academy. The administrative record reveals that the plaintiffs were able to present extensive testimony and evidence to the hearing officer, including sixteen exhibits. After the hearing officer issued a final decision in favor of the Board, the parents filed a request for clarification and reconsideration. That request was denied by the hearing officer. Therefore, the Court concludes that the plaintiffs received an appropriate post-deprivation remedy, and, concomitantly, received all of the due process that was available to them. See also Canton Bd. of Ed. v. N.B and R.B. and State of Connecticut Dept. of Educ., 343 F. Supp.2d 123, 125 n.4 (D.Conn. 2004) (noting that the due process requirements of the IDEA and the Fourteenth Amendment are coextensive).

Consequently, the Court grants the Board summary judgment on count three.

D) Count Four - Connecticut Statutory Law

In count four, the plaintiffs allege that the final decision of the hearing officer violated B's rights under Connecticut's special education laws, Conn. Gen. Stat. § 10-76 *et seq*., and Connecticut's administrative procedure act, Conn. Gen. Stat. § 4-166 *et seq*, on the ground that "it was not based on substantial evidence, was contrary to the evidence on the record, was based on unlawful procedure and was arbitrary, capricious and illegal."

Conn. Gen.Stat. § 10-76h sets forth the procedural and substantive obligations of parents and educational agencies in regard to the IDEA. More specifically, § 10-76h sets forth the

procedures for parties to request a due process hearing, the procedures for Department of

Education to follow in appointing a hearing officer and the powers and duties of the hearing

officer in such a hearing.  In addition, subsection (d)(4) of § 10-76h provides, in relevant part,

that "[a]ppeals from the decision of the hearing officer or board shall be taken in the manner set

forth in [Conn. Gen. Stat. §] 4-183, except the court shall hear additional evidence at the request

of a party."  Section 4-183, however, authorizes appeals from administrative decisions, such as a

hearing officer's decision, to the Connecticut Superior Court, and sets forth limitations on the

court's obligations and powers in such an appeal.  See, e.g., § 4-183(i)-(m).  Rather than pursue

an appeal pursuant to § 4-183 in the Superior Court, the plaintiffs in this case chose to challenge

the hearing officer's decision in this Court pursuant to 20 U.S.C. § 1415(i)(2) (allowing an

aggrieved party to bring a civil action in an appropriate district court).  In other words, this Court

is not subject to the standards governing appeals to the Connecticut Superior Court, but rather is

subject to the procedures and standard of review set forth in § 1415(i)(2).[23]

Consequently, the Court grants the Board summary judgment on count four.

## V.    Conclusion

The evidence in this case supports the hearing officer's final decision, as the Board has

complied with the requirements of the IDEA and has developed an IEP reasonably calculated to

provide educational benefits to B for the 2001-2002.  Accordingly, the Court hereby **GRANTS**

the Board's Motion for Summary Judgment **[Doc. #34]** and **DENIES** the plaintiffs' Motion for

---

[23]Again, under § 1415, a district court: "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B).

Summary Judgment **[Doc. #31]**.  The Clerk is directed to enter judgment in favor of the

defendant and close this case.

So ordered this   29th   day of September, 2005 at Hartford, Connecticut.


_/s/ CFD_____

**CHRISTOPHER F. DRONEY**

**UNITED STATES DISTRICT JUDGE**